# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

STERLING STEEL COMPANY, LLC
on behalf of itself and all others
similarly situated,
No. 1 Leggett Road
Carthage, Missouri 64836

                      Plaintiffs,

vs.

UNION PACIFIC RAILROAD
COMPANY,
1400 Douglas Street
Omaha, Nebraska 68179;

BNSF RAILWAY COMPANY,
2650 Lou Menk Drive
Fort Worth, Texas 76131;

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, Florida 32202;

NORFOLK SOUTHERN
RAILWAY COMPANY Three
Commercial Place Norfolk,
Virginia 23410;and

KANSAS CITY SOUTHERN RAILWAY
COMPANY; 426 West 12'" Street
Kansas City, Missouri 64105;

        and

ASSOCIATION OF AMERICAN
RAILROADS,
50 F Street, NW
Washington, District of Columbia 2001,

                Defendants.

Case No. 08-0122-CV-W-JTM

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff Sterling Steel Company, LLC, individually and on behalf of all other persons similarly situated, states and alleges the following as and for its class action complaint in this case:

## INTRODUCTION

1.    Plaintiff Sterling Steel Company, LLC, brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") who purchased unregulated rail freight transportation services from Defendants Union Pacific Railroad Company, BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company and Kansas City Southern Railway between approximately July 1, 2003 and the present (the "Class Period").

2.    This is an antitrust class action alleging that Defendants conspired to fix, raise, maintain, or stabilize prices of unregulated rail freight transportation services sold in the United States by imposing agreed-upon Rail Fuel Surcharges on rail freight shipments during the Class Period, in violation of Section 1 of the Sherman Antitrust Act.

## JURISDICTION AND VENUE

3.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act (14 U.S.C. §§ 15 and 26) for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs with respect to injuries sustained by Plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act (U.S.C. § 1).

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. § 15 and 26).

2

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district. In addition, a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

**PARTIES**

**A.    Plaintiff**

6.    Plaintiff Sterling Steel Company, LLC, is a Delaware Limited Liability Company with corporate headquarters located in Carthage, Missouri. Sterling manufactures steel which is sold for use in furniture and bedding components and other products. In the course of its business, Sterling purchased unregulated rail freight transportation services directly from one or more of the Defendants during the Class Period and paid Rail Fuel Surcharges thereon.

**B.    Defendants**

7.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country. UP maintains offices at 4801 Gardner Avenue, Kansas City, MO 64120, and 6400 Martin Avenue, Kansas City, MO 64120.

8.    Defendant BNSF Railway Company (BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has

3

offices and rail lines throughout the western United States, extending into the Southeastern states, and maintains an office at 1828 Swift Avenue, Kansas City, Missouri 64116.

9.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Avenue, NW, Suite 560, Washington, DC 20004.

10.    Defendant Norfolk Southern Railway Company ("NSR") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23410. NSR is a major freight railroad operating primarily in the eastern United States. NSR serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NSR operates an intermodal terminal at 100 South Vandom Street, Washington, DC 20001, and maintains a government relations office at 1500 K Street, NW #375, Washington, DC 20005.

11.    Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 426 West 12th Street, Kansas City, Missouri 64105. KCS owns and operates major freight railroad in ten states across the central and south central United States, including the shortest route between Kansas City (the second largest rail hub in the country) and the Gulf of Mexico.

4

12.    Defendant Association of American Railroads ("AAR") is a trade association located in Washington, DC. The AAR publishes key indices used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications. The AAR is governed by a Board of Directors that includes the top executives from Defendants UP and BNSF, and Defendants UP and BNSF are Full Members of the AAR.

13.    "Defendants" refers to all named Defendants in this action, whereas "Railroad Defendants" refers only to UP, BNSF, CSX, NSR and KCS.

### FACTUAL ALLEGATIONS

#### A.    The Freight Railroad Industry

14.    Freight railroads move 42 percent of the freight in this country and are vital to the economy. There are hundreds of common carrier freight railroads operating in the United States. These railroads are classified into different groups based on revenue. The railroads with the largest operating revenue are considered "Class I Railroads." Although Class I Railroads comprise only one percent of the number of U.S. freight railroads, they account for seventy percent of the industry's mileage operated.

15.    The Railroad Defendants comprise the majority of Class I Railroads operating in the United States. They operate more than 90 percent of all domestic railroad tracks and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

5

16.    Freight rail rates are not cost based.  Railroads price their services based on the differing demand for rail transportation of different shippers.  "Unregulated freight" means rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

17.    In the late 1970s, Congress largely deregulated the railroad industry by passing the Railroad Revitalization and Regulatory Reform act of 1976 and the Staggers Rail Act of 1980.

18.    As a result of this legislation, railroads and shippers could enter into private rail freight contracts.  In contracts for rail freight transportation in markets where railroads faced effective competition or in contracts where rates were privately negotiated between the railroad and the shipper, the freight rates are unregulated by government agencies.  Because shippers in some areas may not have competitive alternatives ("captive shippers"), Congress gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates.  The ICC was later abolished by the interstate Commerce Commission Termination Act of 1995, but its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

19.    The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon

6

reasonable request. 49 U.S.C. § 11101(a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper (49 U.S.C. § 10709) or under openly available common carriage rates and service terms. 49 U.S.C. 11101. Rates and service terms established by contract are not subject to STB regulation, except for limited protections against discrimination involving agricultural goods. 49 U.S.C. § 10709(b), (c).

20.    The STB can adjudicate complaints challenging the reasonableness of a common carriage rate only if the carrier has dominance over the traffic involved. 49 U.S.C. §§ 10701(c)-(d), 10704, and 10707. Market dominance refers to "an absence of effective competition from other rail carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10707(a).

21.    The railroad freight industry became highly concentrated after Congress deregulated railroads. In 1976, there were 63 Class I railroads operating in the Untied States. By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely, if not impossible. On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

22.    As railroads contracted for freight transportation services, they increasingly required shippers to enter freight contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF is published by Defendant AAR's Policy and Economics committee based in Washington, D.C., and includes fuel prices as a component of the cost escalation factor. In the fourth quarter of 2000, the AAR – which is controlled by the major Class I Railroads – published a RCAF without fuel as a component,

7

which they called the "ALL-LF." The publication of the ALL-LF facilitated Defendants' ability to assess separate Rail Fuel Surcharges and to coordinate that practice.

**B.    Defendants' Price-Fixing of Rail Fuel Surcharges**

23.    Plaintiff alleges that Defendants set Rail Fuel Surcharges as a percentage of the customers' base freight rate and agreed upon the use of common indices and trigger points for adjusting the percentages monthly. Defendants also published Rail Fuel Surcharges on the Internet to facilitate coordination and the detection of any deviation from collusive pricing. Defendants maintained uniformity of Rail Fuel Surcharges throughout the Class Period by agreeing to compute the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices, timing, and trigger points for adjusting the percentages.

24.    Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to use Rail Fuel Surcharges as revenue generators and profit centers.

25.    In or about April 2003, top executives of the Railroad Defendants attended a National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia. According to its internet site, the "object of the [NFTA] is to provide a forum for transportation executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry. At that meeting, the Railroad Defendants had the opportunity to discuss and agree on the details of Rail Fuel Surcharges that were subsequently implemented in or before July 2003.

8

26.    The key element of Defendants' price-fixing conspiracy was an agreement by the Railroad Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from shippers. The Railroad Defendants agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate.

27.    Such revenue-based fuel surcharges bore no direct relationship to actual increases in fuel costs. According to the STB, the Railroad Defendants have essentially conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by the Defendants for rail freight transportation. Rail Fuel Surcharges, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

28.    The Railroad Defendants implemented and maintained their agreement by publicly announcing surcharge increases and posting the monthly fuel surcharge percentages on their internet sites. This allowed them to monitor and enforce Rail Fuel Surcharge levels.

29.    As a result of Defendants' collusive behavior, prices of rail freight transportation services charged to Class members were raised to or maintained at supra-competitive levels throughout the Class Period.

30.    As early as June of 2003, Defendants UP and BNSF agreed to coordinate their Rail Fuel Surcharge Prices. Prior to this time, Defendant UP's carload fuel surcharge were adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index

9

while Defendant BNSF's carload fuel charge was based on the U.S. Department of Energy ("DOE") On-Highway Diesel Fuel Price Index ("HDF"). In or about June 2003, however, Defendant UP switched to the HDF Index pursuant to an agreement with Defendant BNSF and both Defendants UP and BNSF both consistently charged the same Rail Fuel Surcharge for each month of the Class Period.

31. Defendants UP and BNSF agreed to administer their Rail Fuel Surcharge precisely the same way. Whenever the U.S. average price of diesel fuel, as measured by the HDF Index, equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF index exceeded $1.35 per gallon, however, Defendants UP and BNSF both applied a surcharge of 0.5 percent for every 5 cent increase above $1.35 per gallon. By way of example, if the HDF Index rose 50 cents to $1.85 per gallon, Defendants UP and BNSF would apply a surcharge of 5 percent. The Rail Fuel Surcharge would increase 10 percent for every $1 dollar increase in the HDF index and corresponding increments thereof.

32. Defendants UP and BNSF also coordinated when they could change their Rail Fuel Surcharge. They agreed that this surcharge would be announced the first day of the month following a change in the index and would become effective the month after that. By way of example, if the HDF Index average price changed in January, Defendants UP and BNSF would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. Defendants UP and BNSF published their monthly Rail Fuel Surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

10

33.    Using the HDF index, Defendants UP and BNSF moved in concert and charged virtually identical Rail Fuel Surcharges on a monthly basis through the Class Period.

34.    The Rail Fuel Surcharge Percentages charged by Defendants UP and BNSF for carload shipments varied before the Class Period began, but were identical starting in July 2003.

35.    The choice to use the HDF as a price index for Rail Fuel Surcharges was arbitrary. Also arbitrary were the decisions to set the trigger point at $1.35 per gallon, announce the surcharges on the first day of the month following a change in the index, and to apply the surcharge in the second calendar month after the change in the Index. It is not plausible to suggest that such conduct stems from independent decision-making. Rather, the parallel conduct in conjunction with other factors evidences the existence of agreement in violation of Section 1 of the Sherman Act. It would be completely irrational to believe that Defendants UP and BNSF, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Rail Fuel Surcharges, (5) the dates on which Rail Fuel Surcharges would be announced, (6) the dates on which Rail Fuel Surcharges would become effective, and (7) the amount of the Rail Fuel Surcharges.

36.    The fact that Defendants UP and BNSF both chose and adhered to this same

11

combination of features for their Rail Fuel Surcharge programs evidences that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

37.    Defendants CSX and NSR began to implement the conspiracy no later than February 2004, and KCS agreed to join the conspiracy no later than 2005.

38.    On or before February 2004, Defendants CSX, NSR and KCS agreed to charge a Rail Fuel Surcharge based on the average monthly prices of West Texas Intermediate Crude Oil ("WTI") as published in the *Wall Street Journal*. Defendants CSX, NSR and KCS not only agreed to use the WTI as a price index, they also specifically agreed to administer this index in the same way.

39.    After an initial period in which their agreed-upon WTI price index differed, Defendants CSX, NSR and KCS agreed to apply a Rail Fuel Surcharge whenever the monthly average WTI price exceeded $23 per barrel. When the index hit this point, Defendants CSX, NSR and KCS increased their rates 0.4 percent for every $1 that the WTI price exceeded $23 per barrel. By way of example, if the price of WTI oil was $28 per barrel, Defendants CSX, NSR and KCS's Rail Fuel Surcharge would be two percent. The Surcharge would be adjusted upward by two percent for every $5 increase in the WTI average price.

40.    Defendants CSX, NSR and KCS also coordinated when they would change their Surcharge — two calendar months after the WTI index had adjusted, thereby using the Rail Fuel

12

Surcharge price timing used by BNSF and UP. By way of example, if the WTI average price exceeded $23 per barrel in January, Defendants CSX, NSR and KCS would assess the applicable Rail Fuel Surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants CSX, NSR and KCS could apply the same Rail Fuel Surcharge percentage month after month. Defendants CSX, NSR and KCS published their monthly Rail Fuel Surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

41.    The net result is that there was uniformity between Defendants CSX, NSR and KCS in the monthly Rail Fuel Surcharge percentages they charged customers for most of the Class Period.

42.    The Rail Fuel Surcharge Percentages charged by Defendants CSX, NSR and KCS for carload shipments varied before the Class Period, but were identical starting in February 2004 and June 2005, respectively.

43.    Defendants CSX, NSR and KCS's decision to use the WTI index for Rail Fuel Surcharges was arbitrary. Also arbitrary was the decision to set trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the averaged price of WTI oil had changed.    Given the convergence on such arbitrary conclusions, the conduct of Defendants CSX, NSR and KCS cannot stem from independent decisions. Rather, their conduct is evidence of an agreement in violation of § 1 of Sherman Act. It would be completely irrational to believe Defendants CSX, NSR and KCS, facing myriad differences in economic factors and business demands and requirements, would independently

arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Rail Fuel Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Rail Fuel Surcharges, (5) the dates on which Rail Fuel Surcharges would be me effective, and (6) the amount of the Rail Fuel Surcharges.

44.    The fact that CSX, NSR and KCS both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs evidences that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

45.    In stark contrast to the uniformity among the Railroad Defendants' Rail Fuel Surcharge percentages, fuel costs as operating costs and fuel efficiency differed widely among the Railroad Defendants. Absent conspiracy and collusion, it is highly improbable that the Railroad Defendants would independently set their Rail Fuel Surcharges at the identical percentage each month for a period of more than four years, which is indicative of the Defendants' coordination and conspiracy to horizontally fix prices. In a competitive environment, free of collusion, the railroads will lower fuel costs would impose lower surcharges in order to obtain a competitive advantage.

46.    The Railroad Defendants operate geographically dispersed, multibillion dollar corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and have massive fuel requirements. The Railroad Defendants acquire fuel at different prices at different times to meet their various business requirements. The specifics

14

of the Railroad Defendants' parallel behavior as alleged herein could not result from chance, coincidence, independent responses or mere interdependence unaided by an advanced understanding among the parties.

47.    The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free market conduct.  In a truly competitive market, the levying of surcharges by one or a few railroads based on a percentage of a customer's base rate – bearing no relation to the actual costs of fuel consumed – should create competition on surcharges by other railroads seeking to gain business.  Here, the Railroad Defendants did not compete and the only plausible explanation for that lack of competition is that the Railroad Defendants had entered into an unlawful agreement.  Since the beginning of the Class Period and before, Defendants fixed the price of the Rail Fuel Surcharges in order to fix the prices of rail freight transportation services.  The surcharges were not a cost recovery mechanism; they were a revenue-generating profit center.  By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, the Railroad Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge was applied.

48.    By using the price-fixed Rail Fuel Surcharges to set prices for rail freight transportation services, the Railroad Defendants realized billions of dollars in extra revenues during the Class Period from Plaintiff and members of the proposed Class.

C.    **The Surface Transportation Board's Ruling**

49.    On January 25, 2007, the STB served an administrative decision concluding

that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. The STB directed railroads to stop this unreasonable practice.

50.    Although the STB's decision applied only to regulated freight, the Railroad Defendants followed the same unreasonable practices with regard to the unregulated freight that is the subject of this complaint.

51.    The STB has also issued a Notice of Proposed Rulemaking in which it has proposed rules to monitor the freight railroads' monthly fuel costs, consumption, and revenue from Rail Fuel Surcharges. On August 8, 2007, the STB issued a decision requiring all Class I railroads to segregate and separately report the total fuel-surcharge revenue collected to "monitor industry-wide fuel surcharge practices."

## ANTITRUST "PLUS FACTORS"

52.    Antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.    The railroad industry is highly concentrated. The Railroad Defendants in this case are the largest remaining domestic Class I railroads

16

following decades of mergers and consolidation. The Railroad Defendants account for a significant percentage of the nation's rail freight traffic. Such high concentration facilitates the possibility of a price fixing cartel.

b.      There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. Such an infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.      The Rail Fuel Surcharges were highly standardized. The Railroad Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogenous products or services are susceptible to price fixing.

d.      The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n.*, 166 U.S. 290 (1897), the railroad

17

cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees." Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

     e.     The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to Class I railroads operating in the United States, five of which are defendants in this action. The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings. AAR meeting and events provide an opportunity for the Railroad Defendants to discuss and agree upon a common course of action with respect to Rail Fuel Surcharges.

     f.     Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market:

          (i)     Defendants failed to compete on the Surcharges. In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate – bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery – would

18

compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were "not negotiable." Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsible changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where BNSF is the only carrier. The other Railroad Defendants refused to address the address the concerns of its customers.

(ii)   Defendants' behavior alienated customers. At or about the time the Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether. The Railroad defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should

19

promote competition between carriers for their business. Here, the Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

(iii)    Defendants changed billing practices to expose each other's prices. The Railroad Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, the Railroad Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Railroad Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line. shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

g.    During the Class Period, rail freight demand grew, but each Railroad Defendant's market share remained stable.    Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet the Railroad Defendants' market shares remained relatively stable and constant. The fact that market shares did not fluctuate significantly during a period of demand growth is further indication that the Railroad Defendants agreed to price fix rather

20

than to compete for new sales.

## INTERSTATE TRADE AND COMMERCE

53.    During the Class Period, the Railroad Defendants transported a significant percentage of all rail freight ton-miles within the United States. According to the STB, railway operating revenues for all Class I freight railroads amounted to more than $52 billion in 2006.

54.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market rail freight transportation services. The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## ANTITRUST INJURY

55.    The unlawful conduct, combination or conspiracy alleged herein had, and is having the following effects, among others:

a.    The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed or stabilized at supra-competitive levels;

b.    The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail

21

freight transportation were fixed or stabilized at supra-competitive levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and,

d.    Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

56.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by Plaintiff and the Class is the payment of supra-competitive prices for unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on behalf of the following class:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to through the present and until such time as the unlawful practices cease (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, any Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and all governmental entities.

22

58.    Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the Defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.

59.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges. Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

60.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

61.    There are questions of law or fact common to the Class, including but not limited to the following:

    a.    whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain or stabilize the prices of fuel surcharges imposed on unregulated rail freight transportation services;

    b.    whether the conduct of Defendants caused the prices of unregulated rail freight transportation services to be artificially inflated to non-competitive levels; and

    c.    whether Plaintiff and other class members were injured by Defendants'

23

conduct, and if so, the proper measure of damages.

62.   These and other questions of law are common to the Class, and predominate over any questions affecting only individual Class members.

63.   Plaintiff will fairly and adequately represent the interests of the Class, in that Plaintiff is a typical purchaser of unregulated rail freight transportation services.

64.   A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

65.   Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards or conduct for the Defendants.

## COUNT I

### (Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)

66.   Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

67.   Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

68.   The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a per se violation of the

24

federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

69.    The contract, combination or conspiracy has had the following effects:

a.    Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supra-competitive levels;

b.    Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

d.    Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.    That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be

entered against Defendants on behalf of Plaintiff and each and every member of the Class;

D.  That each of the Defendants' respective offices, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

E.  That Plaintiff and the Class recover treble damages, as provided by law;

F.  That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

G.  For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: February 21, 2008.

Respectfully Submitted,

**PETERSON & ASSOCIATES, P.C.**

By ___*/s/ David M. Peterson*_____
David M. Peterson, Mo. Bar #32229
Nicholas C. Clevenger, Mo. Bar #57171
801 W. 47th St.
Suite 107
Kansas City, MO 64112
(816) 531-4440
(816) 531-0660 (Facsimile)
dmp@petersonlawfirm.com
ncc@petersonlawfirm.com

26

WALTERS BENDER STROHBEHN
& VAUGHAN, P.C.

By____*/s/ Thomas V. Bender*_____
    Thomas V. Bender, Mo. Bar #28099
    R. Keith Johnston, Mo. Bar #37954
    2500 City Center Square
    1100 Main Street
    P.O. Box 26188
    Kansas City, MO 64196
    (816) 421-6620
    (816) 421-4747 (Facsimile)
    tbender@wbsvlaw.com
    kjohnston@wbsvlaw.com


HORN, AYLWARD & BANDY, LLC

By ____*/s/ Robert A. Horn*_____
    Robert A. Horn, Mo. Bar #28176
    Joseph Kronawitter, Mo. Bar #49280
    2600 Grand Blvd., Suite 1100
    Kansas City, MO 64108
    (816) 421-0700
    (816) 421-0899 (Facsimile)
    rhorn@hab-law.com
    jkronawitter@hab-law.com

ATTORNEYS FOR PLAINTIFF
STERLING STEEL COMPANY, LLC
AND THE PROPOSED CLASS

27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Western District of Missouri.

**This cover sheet should be sent to <u>ONE</u> of the following addresses:**

| | |
|---|---|
| **Kansas City** | kcgen@mow.uscourts.gov |
| **Jefferson City** | jcgen@mow.uscourts.gov |
| **Springfield** | spfdgen@mow.uscourts.gov |

**Plaintiff (s):**    **Sterling Steel Company, LLC**

**Defendant (s):**    **Union Pacific Railroad Company ; BNSF Railway Company ; CSX Transportation, Inc. ; Norfolk Southern Railway Company ; Kansas City Southern Railway Company ; Association of American Railroads**

County of Residence: Jasper

County Where Claim For Relief Arose: Jasper

County of Residence: Jackson

Plaintiff's Atty(s):

**David M. Peterson**
**Peterson & Associates**
**801 West 47th Street, Suite 107**
**Kansas City, Missouri  64112**
**816-531-4440**

**Nicholas C. Clevenger**
**Peterson & Associates**
**801 West 47th Street, Suite 107**
**Kansas City, Missouri  64112**
**816-531-4440**

**Thomas V. Bender**
**Walters Bender Strohbehn & Vaughan, P.C.**
**P.O. Box 26188**
**Kansas City, Missouri  64196**
**816-421-6620**

**R. Keith Johnston**
**Walters Bender Strohbehn & Vaughan, P.C.**
**PO Box 26188**
**Kansas City, Missouri  64196**
**816-421-6620**

Defendant's Atty(s):

Robert Horn
Horn Aylward & Bandy
2600 Grand Blvd, Suite 1100
Kansas City, Missouri  64108
816-421-0700


Joseph Kronawitter
Horn Aylward & Bandy
2600 Grand Blvd, Suite 1100
Kansas City, Missouri  64108
816-421-0700

---

II. Basis of Jurisdiction:            **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties
(Diversity Cases Only)
                         Plaintiff:- **N/A**
                         Defendant:- **N/A**


IV. Origin :                          **1. Original Proceeding**

V. Nature of Suit:                    **410 Antitrust**

VI.Cause of Action:                   **15 U.S.C. ss 1 and 15. Claims for price-fixing in violation of the Sherman**
                                      **Antitrust Act of 1890 and the Clayton Act of 1914.**

VII. Requested in Complaint
                    Class Action:
                    Dollar Demand: **Compensatory and statutory damages and injunctive relief**
                    Jury Demand: **Yes**

---

Signature:  /s/ David M. Peterson

  Date:  2/21/2008

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct,
print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display**
**to make the form print properly.**        Revised: 05/09/06

CLOSED, EAPN

# U.S. District Court
## United States District Court for the Western District of Missouri (Kansas City)
## CIVIL DOCKET FOR CASE #: 4:08-cv-00122-JTM
### Internal Use Only

| | |
|---|---|
| Sterling Steel Company, LLC v. Union Pacific Railroad Company et al | Date Filed: 02/21/2008 |
| Assigned to: Magistrate Judge John T. Maughmer | Date Terminated: 04/03/2008 |
| Cause: 15:1 Antitrust Litigation | Jury Demand: Plaintiff |
| | Nature of Suit: 410 Anti-Trust |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Sterling Steel Company, LLC**
*on behalf of itself and all others similarly situated*

represented by **David M Peterson**
Peterson & Associates, PC
Park Plaza Building
801 W. 47th Street
Suite 101
Kansas City, MO 64112
(816) 531-4440
Fax: (816) 531-0660
Email: dmp@petersonlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Kronawitter**
Horn, Aylward & Bandy, LLC
2600 Grand Blvd., Ste. 1100
Kansas City, MO 64108
816-421-0700
Fax: 816-421-0899
Email: jkronawitter@hab-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas S. Clevenger**
Peterson & Associates
801 West 47th Street
Suite 107
Kansas City, MO 64112-1253
(816) 531-4440
Fax: (816) 531-0660
Email: nsc@petersonlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Keith Johnston**
Walters,Bender,Strohbehn & Vaughan, PC
1100 Main St.
2500 City Center Square
Kansas City, MO 64105
(816)421-6620
Fax: (816)421-4747
Email: kjohnston@wbsvlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert A. Horn**
Horn, Aylward & Bandy, LLC
2600 Grand Boulevard
Suite 1100
Kansas City, MO 64108
(816)421-0700
Fax: (816)421-0899
Email: rhorn@hab-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas V Bender**
Walters Bender Strohbehn & Vaughan, PC
1100 Main St
Ste 2500
P O Box 26188
Kansas City, MO 64196
(816)421-6620
Fax: (816)421-4747
Email: tbender@wbsvlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Union Pacific Railroad Company**

**Defendant**

**BNSF Railway Company**

**Defendant**

**CSX Transportation, Inc.**

**Defendant**

**Norfolk Southern Railway Company**

**Defendant**

**Kansas City Southern Railway Company**

**Defendant**

**Association of American Railroads**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2008 | 1 | COMPLAINT against all defendants filed by Thomas V Bender on behalf of Sterling Steel Company, LLC. Filing fee $350, receipt number 08660000000001717236. Service due by 6/23/2008. (Attachments: # 1 Civil Cover Sheet)(Bender, Thomas) (Entered: 02/21/2008) |
| 02/21/2008 | 2 | DISCLOSURE OF CORPORATE INTEREST by Sterling Steel Company, LLC (Bender, Thomas) Modified on 2/22/2008 to edit docket text (McDowell, Shelly). (Entered: 02/21/2008) |
| 02/22/2008 | 3 | Notice of EAP assignment to an outside mediator. (Attachments: # 1 EAP General Order)(Rowland, Bonnie) (Entered: 02/22/2008) |
| 02/22/2008 |  | NOTICE OF MAGISTRATE ASSIGNMENT emailed to Plaintiff's counsel. This is a docket entry only. No document is attached. Magistrate Return due by 3/17/2008 (Rowland, Bonnie) (Entered: 02/22/2008) |

| 02/22/2008 | ◐ | NOTICE OF DOCKET MODIFICATION. A modification has been made to the document filed on 02/21/08 as Document No. 2, NOTICE of filing by Sterling Steel Company, LLC Statement of Corporate Interest to edit docket text. (Related Document 2 ) This is a text entry only - no document is attached. (McDowell, Shelly) (Entered: 02/22/2008) |
|---|---|---|
| 02/22/2008 | ◐ | SUMMONS ISSUED as to Union Pacific Railroad Company, BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, Kansas City Southern Railway Company, Association of American Railroads. (Rowland, Bonnie) (Entered: 02/22/2008) |
| 03/25/2008 | ◐4 | NOTICE of filing by Sterling Steel Company, LLC *Objection to Executive Committee Proposal in MDL Transferee Court* (Bender, Thomas) (Entered: 03/25/2008) |
| 04/03/2008 | ◐5 | CONDITITONAL TRANSFER ORDER (CTO-1) from Jeffery N. Luthi, Clerk of the Panel transferring case to the District of Colubmia. Signed by Unassigned on 4/3/08. (Kee, Georgia) (Entered: 04/03/2008) |
| 04/03/2008 | ◐ | ***Remark: Case file and docket sheet email in pdf documents to District of Columbia. (Kee, Georgia) (Entered: 04/03/2008) |
| 04/03/2008 | ◐ | (Court only) ***Civil Case Terminated. (Kee, Georgia) (Entered: 04/03/2008) |